**CANDIS MITCHELL**
California Bar No. 242797
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
Candis_Mitchell@fd.org


Attorneys for Mr. Jose Maria Perez-Negrete

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE LARRY A. BURNS)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO.: 07CR2873-LAB |
| ) | |
| Plaintiff, ) | DATE: NOVEMBER 26, 2007 |
| ) | TIME: 2:00 P.M. |
| v. ) | |
| ) | |
| JOSE MARIA PEREZ-NEGRETE ) | STATEMENT OF FACTS AND |
| ) | MEMORANDUM OF POINTS AND |
| ) | AUTHORITIES IN SUPPORT OF MOTIONS |
| Defendant. ) | |

**I.**

**STATEMENT OF FACTS**[1]

On September 23, 2007, Border Patrol Agents Shane Blea and Matthew Sturrock were performing linewatch duties in near Chula Vista. As a result of a radio transmission, the responded to the "No Name Draw" and found a number of people walking along the top of the draw. Upon arriving at the draw the agents found a group of eight people walking, some of which departed from the group after the agents' arrival. Agent Blea caught and detained all members of the group who allegedly stated to the agents that they had no documents to enter or remain in the United States.

---

1. The following is based primarily upon information supplied through Government discovery. Mr. Perez-Negrete does not stipulate to its accuracy and reserves the right to challenge it at future proceedings.

1    After questioning, Mr. Perez-Negrete was arrested and transported to the Chula Vista Border Patrol
2 Station for processing. At the station, it was discovered that Mr. Perez-Negrete had an immigration and
3 criminal history. It is alleged that he was read his <u>Miranda</u> rights and chose to not to waive them.

4    On October 17, 2007, an Indictment was handed down charging Mr. Perez-Negrete with violating
5 8 U.S.C. §1326 (a) and (b), deported alien found in the United States who had been removed subsequent to
6 September 13, 2004.

7    These motions follow.

## II.

## MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Mr. Perez-Negrete moves for the production of the following discovery. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

Mr. Perez-Negrete respectfully requests that the Government be ordered to produce discovery because Mr. Perez-Negrete has reason to believe that he has not received all the discoverable material in his case. Mr. Perez-Negrete **specifically requests production of a copy of the taped proceedings and any and all documents memorializing the deportation proceeding allegedly held and any other proceedings that the Government intends to rely upon at trial**. This request includes discovery of materials known to the Government attorney, as well as discovery of materials which the Government attorney may become aware of through the exercise of due diligence. See FED. R. CRIM. P. 16.

Mr. Perez-Negrete has also not received a full copy of his A-file. Mr. Perez-Negrete <u>specifically requests the documents memorializing the alleged deportation proceedings occurring subsequent to September 13, 2004</u> and any other proceedings that the Government intends to rely upon at trial.

Mr. Perez-Negrete additionally requests that the Court order the Government to allow him the opportunity to review his A-file in its entirety. First, the A-file contains documentation concerning his alleged deportation. Part of Mr. Perez-Negrete defense may be that his underlying deportation was invalid. The documents in the A-file would help illuminate the validity or futility of such a defense. For example, A-file documents typically contain biographical information. Such information is essential to determining

1   whether Mr. Perez-Negrete's deportation was invalid.

2   Second, the Government will likely try to show at trial that a Government officer searched the A-file
3   and did not find an application by Mr. Perez-Negrete for permission to enter the United States. Mr. Perez-
4   Negrete anticipates that the Government will attempt to admit a "Certificate of Non-Existence of Record"
5   against him, arguing that if Mr. Perez-Negrete had ever applied for permission to enter the United States,
6   such an application would be found in the A-file and because such an application is not in the A-file, Mr.
7   Perez-Negrete must not have applied for permission to enter the United States.

8   Although the certificate might be admissible, the question of the thoroughness of the search
9   conducted by the Government of the A-file is, and should be, open to cross-examination. United States v.
10  Sager, 227 F.3d 1138, 1145 (2000) (error not to allow jury to "grade the investigation."). Mr. Perez-Negrete
11  should be able to review his A-file in order to see whether any application for lawful admission exists.
12  Moreover, Mr. Perez-Negrete should also be able to verify whether other documents that would ordinarily
13  be in the A-file are "non-existent," or otherwise missing from his A-file. Mr. Perez-Negrete may assert a
14  defense that his application for lawful entry was lost or otherwise misplaced by the Government. He must
15  be allowed the opportunity to review his A-file and the manner in which it is being maintained by the
16  Government in order to present this defense.

17  In addition, Mr. Perez-Negrete moves for the production of the following discovery:

18  1. **Mr. Perez-Negrete's Statements.** The Government must disclose to Mr. Perez-Negrete <u>all</u>
19  copies of any written or recorded statements made by Mr. Perez-Negrete; the substance of any statements
20  made by Mr. Perez-Negrete which the Government intends to offer in evidence at trial; any response by Mr.
21  Perez-Negrete to interrogation; the substance of any oral statements which the Government intends to
22  introduce at trial and any written summaries of Mr. Perez-Negrete's oral statements contained in the
23  handwritten notes of the Government agent; any response to any Miranda warnings which may have been
24  given to Mr. Perez-Negrete; as well as any other statements attributed to Mr. Perez-Negrete. FED. R. CRIM.
25  P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the
26  Government must reveal <u>all</u> Mr. Perez-Negrete's statements, whether written or oral, regardless of whether
27  the Government intends to make any use of those statements. **Mr. Perez-Negrete specifically requests all**
28  **audio and videotaped copies of his statements and any rough notes taken pertaining to the substance**

**of his statements.**

2. **Arrest Reports, Notes and Dispatch Tapes.**  Mr. Perez-Negrete also specifically requests the Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate to the circumstances surrounding his arrest or any questioning.  This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of Mr. Perez-Negrete or any other discoverable material is contained.  Such material is discoverable under FED. R. CRIM. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to Mr. Perez-Negrete.  <u>See</u> FED. R. CRIM. P. 16(a)(1)(B) and (c), FED. R. CRIM. P. 26.2 and 12(i).

3. **Brady Material**.  Mr. Perez-Negrete requests all documents, statements, agents' reports, and tangible evidence favorable to Mr. Perez-Negrete on the issue of guilt and/or which affects the credibility of the Government's witnesses and the Government's case.  Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused.  <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

4. **Any Information That May Result in a Lower Sentence Under The Guidelines.**  Notwithstanding the advisory nature of the sentencing guidelines, the Government must produce this information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), because it is exculpatory and/or mitigating evidence relevant to a possible future determination with respect to sentencing.

5. **Mr. Perez-Negrete's Prior Record.**  Mr. Perez-Negrete requests disclosure of his prior record.  FED. R. CRIM. P. 16(a)(1)(B).

6. **Any Proposed 404(b) Evidence.**  Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial.  Sufficient notice requires the government to "articulate <u>precisely</u> the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." <u>United States v. Mehrmanesh</u>, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4

1  F.3d 1480, 1483 (9th Cir. 1993) (reaffirming Mehrmanesh and reversing convictions).

2  This request includes any "TECS" records as well as any other record(s) of prior border crossings
3  (voluntary entries) that the Government intends to introduce at trial, whether in its case-in-chief, as
4  impeachment, or in its rebuttal case. Although there is nothing intrinsically improper about prior border
5  crossings (except, as here, where there are allegations of undocumented status), they are nonetheless subject
6  to 404(b), as they are "other acts" evidence that the government must produce before trial. United States
7  v. Vega, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

8  The defendant requests that such notice be given three weeks before trial to give the defense time
9  to adequately investigate and prepare for trial.

10  7. **Evidence Seized.** Mr. Perez-Negrete requests production of evidence seized as a result of any
11  search, either warrantless or with a warrant. FED. R. CRIM. P. 16(a)(1)(c).

12  8. **Request for Preservation of Evidence.** Mr. Perez-Negrete specifically requests the preservation
13  of all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care
14  of the Government and which relates to the arrest or the events leading to the arrest in this case. This request
15  includes, but is not limited to, the results of any fingerprint analysis, Mr. Perez-Negrete's personal effects,
16  and any evidence seized from Mr. Perez-Negrete.

17  9. **Henthorn Material.** Mr. Perez-Negrete requests that the Assistant United States Attorney
18  ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent
19  involved in the present case for impeachment material. See Kyles v. Whitley, 514 U.S. 419 (1995) (holding
20  that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on
21  the Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir.
22  1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally
23  conduct examination of records; appropriate Government agency may review files and notify AUSA of
24  contents as long as AUSA makes the determination regarding material to be disclosed); United States v.
25  Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

26  10. **Tangible Objects.** Mr. Perez-Negrete requests the opportunity to inspect, copy, and test, as
27  necessary, all other documents and tangible objects, including photographs, books, papers, documents,
28  fingerprint analyses, or copies of portions thereof, which are material to the defense, intended for use in the

1  Government's case-in-chief, or were obtained from or belong to Mr. Perez-Negrete. FED. R. CRIM. P.
2  16(a)(1)(c). **Specifically, Mr. Perez-Negrete requests copies of the audio tapes of his alleged prior**
3  **deportations or removals.**

4        11. **Expert Witnesses.** Mr. Perez-Negrete requests the name, qualifications, and a written summary
5  of the testimony of any person that the Government intends to call as an expert witness during its case in
6  chief. FED. R. CRIM. P. 16(a)(1)(E). The defense requests the notice of expert testimony be provided at a
7  minimum of two weeks prior to trial so that the defense can properly prepare to address and respond to this
8  testimony, including obtaining its own expert and/or investigating the opinions, credentials of the
9  Government's expert and a hearing in advance of trial to determine the admissibility of qualifications of any
10 expert. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and
11 must determine, reliability and relevancy of expert testimony and such determinations may require "special
12 briefing or other proceedings").

13       12. **Evidence of Bias or Motive to Lie.** Mr. Perez-Negrete requests any evidence that any
14 prospective Government witness is biased or prejudiced against Mr. Perez-Negrete, or has a motive to falsify
15 or distort his or her testimony.

16       13. **Impeachment Evidence.** Mr. Perez-Negrete requests any evidence that any prospective
17 Government witness has engaged in any criminal act whether or not resulting in a conviction and whether
18 any witness has made a statement favorable to Mr. Perez-Negrete. See FED. R. EVID. 608, 609 and 613;
19 Brady v. Maryland.

20       14. **Evidence of Criminal Investigation of Any Government Witness.** Mr. Perez-Negrete
21 requests any evidence that any prospective witness is under investigation by federal, state or local authorities
22 for any criminal conduct.

23       15. **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.**
24 Mr. Perez-Negrete requests any evidence, including any medical or psychiatric report or evaluation, that
25 tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is
26 impaired, and any evidence that a witness has ever used narcotics or other controlled substances, or has ever
27 been an alcoholic.

28       16. **Witness Addresses.** Mr. Perez-Negrete requests the name and last known address of each

prospective Government witness. Mr. Perez-Negrete also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a Government witness.

17. **Name of Witnesses Favorable to Mr. Perez-Negrete.**  Mr. Perez-Negrete requests the name of any witness who made an arguably favorable statement concerning Mr. Perez-Negrete or who could not identify him or who was unsure of his identity, or participation in the crime charged.

18. **Statements Relevant to the Defense.**  Mr. Perez-Negrete requests disclosure of any statement relevant to any possible defense or contention that he might assert in his defense.

19. **Jencks Act Material.**  Mr. Perez-Negrete requests production in advance of trial of all material, including dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at trial to allow Mr. Perez-Negrete to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963). In United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) the Ninth Circuit held that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.

20. **Giglio Information & Agreements Between the Government and Witnesses.**  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Perez-Negrete requests all statements and/or promises, express or implied, made to any witness, in exchange for their testimony in this case, and all other information which could be used for impeachment.

21. **Agreements Between the Government and Witnesses.**  Mr. Perez-Negrete requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement, promise, or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective Government witness and the Government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any discussion with a potential witness regarding that witness' immigration status and/or any affect that the

witness' statements or lack thereof might have on that status, including the granting or revoking of such immigration status or any other immigration status, including but not limited to citizenship, nationality, a green card, border crossing card, parole letter, or permission to remain in the United States.

22. **Informants and Cooperating Witnesses.**  Mr. Perez-Negrete requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Perez-Negrete. The Government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The Government must disclose any information derived from informants which exculpates or tends to exculpate Mr. Perez-Negrete. Brady v. Maryland, 373 U.S. 83 (1963)

23. **Bias by Informants or Cooperating Witnesses.**  Mr. Perez-Negrete requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States, 405 U.S. 150 (1972). Such information includes, but is not limited to, any inducements, favors, payments or threats that were made to the witness in order to secure cooperation with the authorities.

24. **Scientific and Other Information.**  Mr. Perez-Negrete requests the results of any scientific or other tests or examinations conducted by any Government agency or their subcontractors in connection with this case. See Rule 16(a)(1)(D).

25. **Residual Request.**  Mr. Perez-Negrete intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. Mr. Perez-Negrete requests that the Government provide him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

**III.**

**THIS COURT SHOULD DISMISS THE INDICTMENT FOR ITS FAILURE TO ALLEGE ESSENTIAL ELEMENTS OF THE OFFENSE**

The indictment charges Mr. Perez-Negrete with being a previously-deported alien found in the United States in violation of 8 U.S.C. § 1326. The indictment fails to allege elements necessary to convict

Mr. Perez-Negrete of the offense: that Mr. Perez-Negrete knew he was in the United States, he failed to undergo inspection and admission by an immigration officer at the nearest inspection point, and that he voluntarily entered the United States. As a consequence, it must be dismissed. See e.g., Nyrienda v. I.N.S., 279 F.3d 620 (8th Cir. 2002) (setting forth the components of an entry under the immigration law); see also United States v. Pernillo-Fuentes, 252 F.3d 1030 (9th Cir. 2001); United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999);.

However, because these issues were decided against Mr. Perez-Negrete in United States v. Rivera-Sillas, 376 F.3d 887 (9th Cir. 2004), they are not briefed herein, but are raised to preserve them for further appeal. (Mr. Perez-Negrete would be happy to submit further briefing on these issues to this Court, if so ordered.)

**IV.**

**THE COURT MUST SUPPRESS ANY STATEMENTS BY MR. PEREZ-NEGRETE**

**A.    The Court Must Suppress Mr. Perez-Negrete's Alleged Pre-Miranda Statements Because They Were Elicited as the Result of Custodial Interrogation.**

The material produced thus far by the government indicates that Agent Blea first confronted and interrogated Mr. Perez-Negrete, regarding his immigration status, shortly after 6:00 pm in an isolated area north of the International Border. This entire interrogation proceeded any form of administration of Miranda rights by the agents by approximately six-and-a-half hours.

"The ruling in Miranda prohibits 'custodial interrogation' unless the government first gives warnings to the [subject of the interrogation]." United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir. 1990). Custodial interrogation occurs when under the totality of the circumstances the questions asked by the police are reasonably likely to elicit an incriminating response from the subject. Id. Although questions that include routine biographical information usually do not trigger the safeguard of Miranda v. Arizona, "[t]hat exception is inapplicable . . . where the elicitation of information regarding immigration status is reasonably likely to inculpate the [subject]." Id.

In <u>United States v. Kim</u>, 292 F.3d 971, 973 (9th Cir. 2002),[2] the Ninth Circuit noted that the following factors are to be considered in deciding whether or not a police-dominated atmosphere exists: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." <u>Id.</u> (citations omitted); <u>see also</u> <u>United States v. Estrada-Lucas</u>, 651 F.2d 1261, 1265 (9th Cir. 1980) (in context of custody at the border "[t]he factors to be weighed are the language used to summon him, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the pressure exerted to detain him."). The Ninth Circuit also recognizes that "question[s] implying that [the agent] suspected [the defendant] of criminal activity" can give rise to a reasonable belief that one is not free to ignore the questions and leave. <u>United States v. Chavez-Valenzuela</u>, 268 F.3d 719, 725 (9th Cir. 2001).[3]

It is not necessary that an individual be physically restrained in any fashion. In <u>Beraun-Panez</u>, the Ninth Circuit found that an individual questioned out in an open field, who was neither held nor handcuffed nor told that he was under arrest, was nonetheless in custody for <u>Miranda</u> purposes. <u>Beraun-Panez</u> held that "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding." 812 F.2d at 580.[4]

Here, the criteria for a police-dominated atmosphere as articulated in <u>Kim</u> are clearly met. Regarding the language used by Agent Blea to summon Mr. Perez-Negrete, while the report does not state the exact words used in identifying himself as a border patrol agent and to get Mr. Perez-Negrete into custody, whatever words used clearly indicated to Mr. Perez-Negrete that Agent Blea was a law enforcement officer and that Mr. Perez-Negrete was in custody. The facts that Agent Blea was in uniform carrying his gun, and

---

[2] In <u>Kim</u>, the Ninth Circuit found that a Korean woman who went to her own store, voluntarily, because an officer's visit prompted her to do so was in custody even though she was in familiar surroundings because the police "temporarily took over complete control of Kim's store creating a 'police-dominated atmosphere." 292 F.3d at 977. This combined with difficulty with English and isolation from family supported the finding that Kim did not willingly agree to submit to an encounter with the police. <u>Id.</u>

[3] <u>Chavez-Valenzuela</u> involved a roadside stop of a motorist on a public street, out in the open.

[4] The police confronted Beraun-Panez with his alienage, accused him of lying and kept him separated from his co-worker in a remote rural area. <u>Beraun-Panez</u>, 812 F.2d at 580.

in an isolated area with no means to escape substantiate this factor. Additionally, it is alleged that Agent Blea confronted Mr. Perez-Negrete shortly after he began to run away from the rest of the group that had been detained, enhancing any belief by Mr. Perez-Negrete that he would be unable to leave..

Concerning the extent to which Mr. Perez-Negrete was confronted with guilt, he was apprehended in an isolated area and immediately interrogated about his immigration status. The physical surrounding of the interrogation was clearly a remote area as evidenced by the reports description as the "No Name Draw"and devoid of any landmarks such as homes or businesses. It is, however, unclear how long the detention took place or the amount of pressure applied to Mr. Perez-Negrete since Agent Blea's report does not address how long the interrogation and detention took and only uses boiler-plate language to describe Mr. Perez-Negrete's responses. Further, the defendant in Kim was isolated from family, a fact that the Court gave great weight to. Kim, 292 F.3d at 977. Here, Mr. Perez-Negrete was alone in a remote and rural area, as in Beraun-Panez, with two armed border patrol agent.. Thus, the statements must be suppressed.

Not only did the questioning here occur in a "police-dominated atmosphere" where Mr. Perez-Negrete was isolated, the agent's questioning bore on Mr. Perez-Negrete's alienage, which is an element of the charged offense, 8 U.S.C. § 1326. See United States v. Meza-Soria, 935 F.2d 166, 171 (9th Cir. 1991). This question in such a setting carried with it implicit suspicion of criminal activity. A person, such as Mr. Perez-Negrete, subjected to such questioning in such a situation obviously does not reasonably feel free to leave, and thus is subject to custodial interrogation. See Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).

In the context of an encounter between border patrol and an individual near the international border, any questioning regarding an individual's alienage falls under the rubric of custodial interrogation. Furthermore, because of the close relationship between civil and criminal immigration investigations, "[c]ivil as well as criminal interrogation of in-custody defendants by INS [agents] should generally be accompanied by the Miranda warnings." United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir. 1983).

In United States v. Gonzalez-Sandoval, 894 F.2d at 1043 (9th Cir. 1990), the defendant appeared at a local police station to provide his state parole officer with a urine sample. Id. at 1046. A second parole officer accused Mr. Gonzalez-Sandoval of being a deported alien and called the Border Patrol. Id. The

Border Patrol came to the station, and without warning him pursuant to Miranda, asked Mr. Gonzalez-Sandoval where he was born and whether he possessed documents to verify the legality of his presence in the United States. Id. The Border Patrol agents then took Mr. Gonzalez-Sandoval to the Calexico Border Patrol Station. Failing to administer the Miranda warnings a second time, the agents questioned Mr. Gonzalez-Sandoval about any alias he possessed. Id. The agents ran an INS record check against Mr. Gonzalez-Sandoval's name and alias, and found Mr. Gonzalez-Sandoval's prior immigration record. Id. The Ninth Circuit found that the district court erred in failing to suppress the unwarned, prompted statements by Mr. Gonzalez-Sandoval about his name and alias. Id. at 1047.

In United States v. Mata-Abundiz, an INS agent visited the defendant in a state jail to obtain biographical information to determine the defendant's citizenship status. 717 F.2d at 1278. The agent knew about the state charges against Mr. Mata-Abundiz, and did not warn him pursuant to Miranda prior to obtaining the biographical data. Id. Afterwards, the agent made further inquiries at his office and within three hours returned to the jail to charge Mr. Mata-Abundiz with a federal immigration offense. Id. Despite the fact that the agent characterized his interrogation as pursuant to a civil investigation, the court held that the agent should have warned Mr. Mata-Abundiz as required by Miranda because the agent knew his interrogation could lead to federal charges against the defendant. Id. at 1278-1279.

Here, it is obvious that the information the agent elicited from Mr. Perez-Negrete, during the interrogation, regarding his citizenship, application for permission to enter, and use of a document was "reasonably likely to inculpate" him. The questions served no purpose other than inculpation. They are in fact two of the four elements that they government must prove to obtain a conviction for a violation of 8 U.S.C. § 1326. Moreover, it is undisputed that Mr. Perez-Negrete was not read his Miranda rights at that point, nor advised that his answers to the agent's questions could result in federal charges against him. Therefore, statements must be suppressed.

**B.  Mr. Perez-Negrete Requests a Hearing Pursuant to 18 U.S.C. § 3501 Concerning The Admissibility Of Any Statements That The Government Intends to Use Against Him at Trial.**

This Court should conduct an evidentiary hearing to determine whether Mr. Perez-Negrete's statements should be admitted into evidence. Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury, whether any statements made by Mr. Perez-Negrete were voluntarily made.

1  In addition, § 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Perez-Negrete understood the nature of the charges against him and whether he understood his rights.

Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" Id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleadings.

## V.

## **MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

Defense counsel has received a limited amount of discovery. As more information comes to light, due to the government providing additional discovery in response to these motions or an order of this Court, the defense may find it necessary to file further motions. It is, therefore, requested that defense counsel be allowed the opportunity to file further motions based upon information gained through the discovery process.

## VI.

## **CONCLUSION**

For the foregoing reasons, Mr. Perez-Negrete respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: October 23, 2007

*s/ Candis Mitchell*
**CANDIS MITCHELL**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Perez-Negrete
Candis_Mitchell@fd.org